FILED - USDC - FLMD - FTM
OCT 7 2026 AM10:54

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**TRACEY COFFIN,** **Case No.:** 2:26-cv-2751-SPC-KRH

**Plaintiff,**

**v.**

**PUNTA GORDA HOUSING AUTHORITY,**

**Defendant.**

# COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF UNDER 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT
# DECLARATORY RELIEF REQUESTED
# DEMAND FOR A JURY TRIAL

**Plaintiff Tracey Coffin**, proceeding pro se, brings this action against Defendant Punta Gorda Housing Authority ("PGHA") to vindicate Plaintiff's own federal rights and recover Plaintiff's own damages. Plaintiff alleges:

## I. NATURE OF THE ACTION AND SCOPE OF PLAINTIFF'S CLAIMS

1. This action asserts only Plaintiff Tracey Coffin's own federal rights, injuries, and damages. Plaintiff does not seek to recover

damages belonging independently to her mother, Christine Coffin, or to Plaintiff's minor children.

2. References to Plaintiff's mother, children, landlords, caseworkers, and other nonparties are necessary because federally assisted housing is administered through an approved family and household composition, and because conduct involving the assisted household directly affected Plaintiff's own housing, rent, tenancy, financial obligations, displacement, and damages.

3. Beginning in approximately 2021, Plaintiff participated in the Housing Choice Voucher ("HCV") program administered by PGHA in her own right as Head of Household. Plaintiff alleges that this was existing assistance, not merely an application for future benefits.

4. PGHA administered Plaintiff's family composition, income reporting, subsidy, tenant contribution, unit size, landlord/HAP relationship, and related program requirements. Plaintiff also participated in the Family Self-Sufficiency ("FSS") program.

5. Plaintiff alleges that PGHA terminated or removed her from that existing assistance in 2023 without constitutionally adequate notice and a meaningful opportunity to be heard before the deprivation became effective.

6. The consequences did not end in 2023. Plaintiff alleges that the loss of stable assistance was followed by repeated housing instability, temporary lodging, subsequent assisted tenancies, recurring rent and utility problems, a later HUD-VASH-assisted household with Plaintiff recorded as Co-Head, cessation of HAP, eviction, approximately $10,000 in claimed rent or eviction liability imposed against Plaintiff personally, displacement, property loss, and continuing dependence upon temporary housing assistance.

7. Plaintiff does not allege that every later landlord, charity, caseworker, or housing provider participated in PGHA's original constitutional deprivation. Those later events are pleaded where they

establish causation, mitigation, continuing injury, damages, notice, or the location of relevant records.

## II. JURISDICTION, VENUE, AND PRIOR FEDERAL ACTION

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because Plaintiff asserts claims under 42 U.S.C. § 1983 and the Fourteenth Amendment.

9. Venue is proper in the Fort Myers Division of the Middle District of Florida because substantial events giving rise to Plaintiff's claims occurred within this District and PGHA is located within this District.

10. Plaintiff previously filed a federal action concerning related housing events. That action was dismissed without prejudice after the Court concluded that the operative pleading appeared to assert rights belonging to Plaintiff's mother rather than claims confined to Plaintiff's own legally cognizable interests.

11. Plaintiff thereafter sought post-judgment relief and leave to amend to clarify her own claims. That request was denied.

12. This new action is intended to cure that pleading defect. Plaintiff relies on her own preexisting HCV participation, her own Head-of-Household status, her own later recorded Co-Head status to the extent established by the administrative record, and the economic and non-economic injuries imposed directly upon Plaintiff.

## III. PARTIES AND MATERIAL NONPARTY ACTORS

13. Plaintiff Tracey Coffin is an adult resident of Lee County, Florida. During the events beginning approximately in 2021, Plaintiff alleges she was an HCV participant and Head of Household.

14. Defendant Punta Gorda Housing Authority is a Florida public housing authority administering federally funded housing-assistance programs, including HCV assistance. PGHA acted under color of state law when administering and terminating Plaintiff's housing assistance.

15. Becky Madsen ("Madsen") was a PGHA employee and Plaintiff's housing caseworker and/or principal PGHA contact during material

portions of Plaintiff's HCV participation. Madsen communicated with Plaintiff concerning household composition, income, records, hearing requests, VAWA-related matters, and termination. Madsen is pleaded as a material factual actor and is not presently named as an individual defendant.

16. Kurt Pentelecuc ("Pentelecuc") was a PGHA official involved in the later HUD-VASH and records disputes. He is pleaded as a material factual actor and is not presently named as an individual defendant.

17. Michael and Debra Albert ("the Alberts") were landlords associated with Plaintiff's Ann Arbor assisted tenancy. Their conduct and communications with PGHA are relevant to PGHA's notice of Plaintiff's domestic-violence circumstances, disputed occupancy, lease enforcement, causation, and damages. They are not presently named as defendants.

18. Rossman Realty Property Management and its personnel managed the later Hardey Street tenancy. Rossman's conduct is

relevant to the HAP relationship, lease, rent demands, eviction, and damages following cessation of HAP. Rossman is not presently named as a defendant.

19. Other persons and entities, including Murdock Circle/Peninsula management, JFCS personnel, current property-management personnel, and relevant VA/HUD-VASH personnel, are identified only where their conduct or records bear on Plaintiff's chronology, mitigation, continuing damages, or the administration of the assisted household.

## IV. THE FEDERALLY ADMINISTERED FAMILY AND HOUSEHOLD

20. The HCV program is not administered as though each person living in an assisted residence occupies an unrelated private household. PGHA administers an approved assisted family and household composition under federal program requirements.

21. Family composition and family income are material to program eligibility, tenant rent, housing-assistance payments, family unit size, recertification, and continued participation. Participant families are required to provide information concerning income and family composition and to report changes as required by federal regulations and the PHA's administrative plan. See, e.g., 24 C.F.R. §§ 982.516 and 982.551.

22. PGHA therefore required Plaintiff to report household members, persons entering or leaving the assisted family, employment and income information, child support and public-benefit information, and other changes material to program administration.

23. Plaintiff does not contend that every person listed in an assisted family possesses identical statutory rights. Plaintiff alleges that PGHA's administration of the family composition directly affected Plaintiff because Plaintiff was herself an HCV participant and Head of

Household during the earlier assistance and was later recorded as Co-Head in the HUD-VASH-assisted household.

24. Accordingly, references to Christine and Plaintiff's children do not transform this case into an assertion of their independent rights. Those facts explain Plaintiff's own participant status, the family composition PGHA administered, the rent and subsidy calculations affecting Plaintiff, and why termination of assistance caused Plaintiff herself to lose housing and incur financial consequences.

## V. FEDERAL PROCEDURAL PROTECTIONS

25. Under 24 C.F.R. § 982.555, specified PHA determinations affecting participant families, including termination of assistance because of a family's action or failure to act, require written notice stating the reasons for the decision and informing the family of the right to request an informal hearing within the time prescribed by the PHA.

26. For matters subject to an informal hearing, federal regulations also provide procedural protections concerning examination of directly relevant PHA documents before the hearing and an opportunity to present evidence and question evidence against the family.

27. Plaintiff also alleges that PGHA knew that domestic violence was material to her housing circumstances and that Plaintiff sought VAWA-related housing protection. Plaintiff pleads VAWA-related requirements as part of PGHA's notice, the context of disputed occupancy and adverse information, and the process PGHA allegedly failed to provide; Plaintiff does not allege that every regulatory violation independently creates a § 1983 damages claim.

28. For HCV-assisted tenancies, federal program documents include a HAP contract and HUD tenancy addendum. Plaintiff alleges that the lease packages furnished to her or the assisted household during the Ann Arbor, Murdock Circle/Peninsula, and Hardey Street assisted

tenancies did not contain the HUD tenancy addendum. Plaintiff seeks the actual HAP contracts, addenda, approved leases, and related records through discovery and does not allege without discovery that no such document exists anywhere in PGHA's or an owner's files.

## VI. FACTUAL ALLEGATIONS

### A. Plaintiff's Own HCV, Ann Arbor, Domestic Violence, and the Alberts

29. Beginning in approximately 2021, Plaintiff participated in HCV assistance administered by PGHA in her own right as Head of Household. During this period, Plaintiff was also participating in FSS and attempting to establish stable housing and economic independence for herself and her children.

30. Plaintiff's Ann Arbor assisted tenancy involved landlords Michael and Debra Albert. At the time, Plaintiff was married to Paul Ryniec but was attempting to separate from and divorce him.

31. Plaintiff alleges that the Alberts repeatedly demanded that Ryniec leave the property and communicated with Plaintiff about his continued presence. Plaintiff alleges Ryniec nevertheless refused to leave during portions of the separation.

32. Plaintiff was therefore placed in the conflicting position of attempting to comply with landlord and housing-program requirements while also attempting to remove an unwilling spouse from the marital residence during an abusive and unstable domestic relationship.

33. The Alberts reported or communicated Ryniec's continued presence to Madsen and PGHA. Plaintiff alleges PGHA consequently had notice not merely of an alleged occupancy issue, but of the surrounding separation and domestic-violence circumstances.

34. On October 5th, 2021, Plaintiff received a landlord notice concerning the Ann Arbor tenancy with a stated termination date of November 30th, 2021. Plaintiff alleges the notice referenced Ryniec's

occupancy and property concerns and was copied or communicated to PGHA.

35. On March 30th, 2022, Plaintiff communicated with Madsen concerning Ryniec, housing and safety issues, and the need to move.

36. Plaintiff alleges that while she was attempting to separate from Ryniec and obtain stability through her voucher, disputed occupancy allegations concerning his refusal to leave became adverse housing-program information.

37. Plaintiff was later arrested during the domestic relationship. Plaintiff alleges that after her arrest, Ryniec remained at the residence with Plaintiff's children and another adult for a period of time despite the earlier pressure directed at Plaintiff concerning his presence.

38. Plaintiff alleges the Alberts later pursued eviction involving Ryniec, but an eviction record also became associated with Plaintiff's name. Plaintiff alleges that this record has contributed to subsequent housing barriers.

39. Plaintiff does not presently assert a federal claim against the Alberts. Their conduct is pleaded because it bears on PGHA's contemporaneous knowledge, the factual basis PGHA may have used in administering Plaintiff's voucher, and Plaintiff's resulting housing history and damages.

## B. Household Composition, FSS, Income, and SSI

40. On June 13th, 2022, Madsen informed Plaintiff in substance that Plaintiff was then a two-bedroom voucher household and that if Plaintiff's mother were approved, the family would become a three-bedroom voucher household. Plaintiff alleges this communication confirms active PGHA administration of Plaintiff's own voucher and household composition.

41. On July 15th, 2022, Plaintiff requested access to her original paperwork and requested a hearing. PGHA responded concerning the written hearing request and/or file review on or about July 18th, 2022.

42. Plaintiff alleges she participated in PGHA's FSS program. The termination of her HCV allegedly interrupted or ended that participation and the opportunity to continue accumulating any escrow for which she qualified. Plaintiff seeks the FSS Contract of Participation, escrow accounting, income calculations, termination records, and any forfeiture or disbursement records.

43. A PGHA application or pre-application record in Plaintiff's possession identifies Plaintiff as Head of Household, lists household members, and reflects SSI among disclosed income sources. Plaintiff alleges the SSI at issue belonged to her minor son, not Plaintiff.

44. Plaintiff alleges PGHA later asserted that SSI had not been properly disclosed and required or sought retroactive payment or repayment. Plaintiff disputed that assertion and requested the original application and related records.

45. Plaintiff alleges the complete administrative record necessary to resolve that dispute remains within PGHA's possession or control,

including applications, recertifications, HUD-50058 records, income-verification records, discrepancy records, calculations, repayment documents, notices, and case notes.

### C. VAWA, Notice, and Termination of Plaintiff's Existing Assistance

46. By early 2023, PGHA knew that Plaintiff's housing circumstances involved domestic violence, separation, disputed occupancy, and an arrest arising during the domestic relationship.

47. On February 27th, 2023, Plaintiff specifically asked Madsen what documentation her lawyer needed to provide concerning VAWA.

48. On February 28th, 2023, Madsen informed Plaintiff in substance that Plaintiff had not supplied required material, that a termination-of-benefits notice had been mailed, and that Plaintiff would need to follow the stated procedures.

49. Plaintiff alleges she never received that termination notice before the adverse action.

50. On March 20th, 2023, Plaintiff advised Madsen that paperwork had been sent to a residence Plaintiff was not permitted to enter and supplied a different Cape Coral mailing address.

51. Madsen responded in substance that Plaintiff had "already been removed from the program." Plaintiff alleges she therefore learned that PGHA considered her removed only after the adverse action had already occurred or had substantially been completed.

52. PGHA later represented or treated Plaintiff's assistance as terminated effective approximately March 31st, 2023.

53. Plaintiff alleges PGHA had multiple opportunities to provide notice reasonably calculated to reach her, identify the actual factual grounds and records relied upon, address the known domestic-violence context, and provide the applicable informal hearing before terminating her existing assistance.

54. Plaintiff alleges the absence of meaningful pretermination process was material because she disputed or would have disputed

material matters including household occupancy, SSI or income disclosure, domestic-violence-related circumstances, arrest information, and other adverse facts PGHA may have relied upon.

55. Plaintiff alleges the termination caused loss of stable subsidized housing, interruption of FSS participation, increased housing costs, relocation and transportation burdens, housing barriers, and substantial emotional distress.

### D. Homelessness, Temporary Lodging, and Murdock Circle/Peninsula

56. After the loss of stable housing, Plaintiff sought emergency shelter and housing assistance. Plaintiff alleges the Charlotte County Homeless Coalition, later known as Charlotte Cares, did not admit the household, and Plaintiff incurred temporary-lodging and hotel consequences while attempting to keep her family housed.

57. Plaintiff pleads the shelter denial as part of her damages and mitigation history, not as a federal claim against the shelter organization in this action.

58. Plaintiff and her household later resided at Murdock Circle Apartments, subsequently known as Peninsula at Port Charlotte, in an assisted tenancy.

59. During the Murdock Circle/Peninsula period, Christine began receiving housing-related assistance associated with her status as an elderly veteran. Plaintiff pleads this as the beginning of the household's transition into veteran-related housing assistance after Plaintiff had previously possessed HCV assistance in her own right.

60. Plaintiff alleges that the transition did not erase Plaintiff's prior history as an HCV participant or make Plaintiff and her children unrelated to the administration of the assisted household. Plaintiff continued residing in the household with her children, while household composition, income, rent, utilities, unit size, and

continued occupancy remained material to the housing assistance being administered.

61. Plaintiff does not seek Christine's veteran benefits or damages belonging independently to Christine. Christine's veteran-related assistance is alleged to explain the chronology by which Plaintiff and her children moved from Plaintiff's own prior HCV participation into housing increasingly dependent upon assistance connected to Christine's veteran status, culminating in the later Hardey Street HUD-VASH tenancy.

62. Plaintiff alleges that this transition is material to her own damages because, after the termination of Plaintiff's own voucher, Plaintiff no longer possessed the same independent housing stability and instead became dependent upon assistance administered through the household in which Christine was the qualifying veteran. Later interruptions or termination of that assistance therefore directly

affected Plaintiff's own home, rent exposure, displacement, and financial obligations.

63. Plaintiff alleges the household then included four persons, including Plaintiff, her mother, her minor son, and her minor daughter, while the household was maintained in a two-bedroom unit.

64. Plaintiff does not allege that federal law automatically required a particular bedroom count solely from those facts. Plaintiff seeks PGHA's then-effective subsidy standards, family-unit-size determination, HUD-50058 records, approved lease, HAP contract, and related calculations.

65. Plaintiff alleges the Murdock Circle/Peninsula lease materials furnished to the household did not contain the HUD tenancy addendum.

66. Plaintiff further alleges recurring disputes concerning rent balances, utility responsibility, payment, and threatened housing instability during this tenancy. Plaintiff seeks the underlying ledgers,

utility allowances, HAP calculations, notices, and communications rather than asking the Court to infer wrongdoing merely from a disputed balance.

### E. Hardey Street, HUD-VASH, and Plaintiff's Direct Financial Injury

67. Plaintiff and her household subsequently moved from Murdock Circle/Peninsula to 2211 Hardey Street, Punta Gorda, Florida, a three-bedroom residence managed by Rossman Realty Property Management and associated with HUD-VASH assistance administered through PGHA. Plaintiff alleges the Hardey tenancy continued the household's veteran-related housing-assistance chronology rather than arising as an unrelated housing event.

68. Christine was the qualifying veteran. Plaintiff does not claim veteran status or veteran-only benefits as her own.

69. Plaintiff alleges PGHA records identified Plaintiff as Co-Head of the assisted household, and a November 24th, 2025 communication

stated in substance that both Christine and Tracey were on the voucher.

70. Plaintiff alleges the Hardey Street lease materials furnished to the household did not contain the HUD tenancy addendum. Plaintiff seeks the executed HAP contract, HUD tenancy addendum, approved lease, family-composition records, utility schedule, HAP ledger, rent calculations, and termination communications.

71. Plaintiff alleges problems began shortly after occupancy, including an air-conditioning problem and disputes involving solar equipment, FPL, and utility administration. Plaintiff pleads those events to establish the condition and administration of the tenancy and will rely on the underlying records rather than speculation about motive.

72. PGHA later treated HAP as terminated effective approximately November 30th, 2025, or December 1st, 2025.

73. Plaintiff alleges she did not knowingly request the termination of her own recognized Co-Head or assisted-household status and did not receive meaningful pretermination process directed to her before the subsidy supporting her residence ceased.

74. After HAP ceased, Rossman imposed or sought full market rent and pursued eviction consequences.

75. Although Plaintiff and Christine were both associated with the lease and assisted household, Plaintiff alleges that approximately $10,000 in claimed rent and/or eviction liability was imposed against Plaintiff personally, not Christine, subject to confirmation from the eviction record, landlord ledger, and HAP records.

76. Plaintiff therefore alleges the approximately $10,000 liability and resulting eviction history as Plaintiff's own economic injury. Plaintiff was personally exposed to the financial consequences after the subsidy ceased even while PGHA later disputed or minimized Plaintiff's individual interest in the underlying assistance.

77. Plaintiff further alleges that belongings belonging to Plaintiff and her children were placed outside on or about June 2nd, 2026, resulting in loss or damage to personal property and additional displacement.

78. The Hardey Street termination and eviction therefore caused injuries personal to Plaintiff, including market-rent exposure, debt, eviction history, relocation expenses, property loss, employment and transportation disruption, and emotional distress.

### F. Disputed VAWA-Related Document and Records

79. During the later dispute, PGHA displayed, maintained, or relied upon VAWA-related paperwork bearing or reproducing a signature attributed to Christine and portraying Plaintiff as presenting a danger or safety concern to Christine.

80. Christine disputes knowingly signing or authorizing the document in the form later presented and disputes representing that Plaintiff was a danger to her.

81. Plaintiff disputes the document's authenticity, provenance, completeness, and characterization. Plaintiff does not allege as an established fact who created, copied, altered, uploaded, or assembled the disputed document because Plaintiff has not received the original record and audit trail necessary to determine those facts.

82. The disputed characterization concerned Plaintiff herself and was capable of affecting Plaintiff's housing status, her role within the assisted household, her advocacy and caregiving relationship, and later representations concerning Plaintiff.

83. Plaintiff seeks the original/native document, all versions and attachments, signature or e-sign audit information, scanning and upload history, creation and modification information, case notes, relevant communications, and records showing whether and how the document was relied upon.

84. Plaintiff further seeks records sufficient to determine whether PGHA considered Plaintiff's prior arrest, domestic-violence

circumstances, VAWA status, or disputed occupancy information when terminating or administering Plaintiff's housing assistance.

## G. Successive Utility Problems and Continuing Housing Instability

85. Plaintiff alleges that recurring utility and housing-administration problems have accompanied successive housing arrangements: during Plaintiff's own earlier assisted housing, during later assisted housing shared with Christine, during Hardey Street, and presently while the household relies upon temporary assistance.

86. Plaintiff does not allege merely from recurrence that every landlord, caseworker, charity, or provider acted pursuant to a common agreement. Plaintiff alleges the successive events because they demonstrate the duration of her housing instability, her efforts to mitigate damages, and the continuing absence of durable replacement assistance.

87. The recurring issues have included disputes or delays concerning utility responsibility, utility payments, account status, threatened interruption of service, rent balances, resident records, and communications among landlords, property managers, caseworkers, and assistance providers.

88. Plaintiff alleges that utility continuity was particularly important because utility obligations and continued occupancy were intertwined with maintaining assisted housing. Plaintiff seeks the actual bills, utility allowances, lease provisions, HAP records, payment records, and communications necessary to determine responsibility for each event.

### H. Present JFCS-Supported Housing and Ongoing Injury

89. Plaintiff presently resides with her household in Lee County while rent and/or housing expenses are being supported through JFCS or related temporary charitable assistance.

90. Plaintiff alleges she presently has no documentation establishing that she holds an active HCV in her own name. Plaintiff further alleges the household has not been provided a definite written determination establishing when durable voucher assistance will begin or how long the present temporary assistance will continue.

91. Plaintiff alleges that JFCS personnel have required continued participation and documentation from the veteran household member while communications with Plaintiff have at times been limited on the stated ground that Plaintiff herself is not a veteran.

92. Plaintiff further alleges that the current property manager has made statements concerning Plaintiff's ability to be added to housing records based on veteran status and has recently sent communications asserting possible lease violations while copying a JFCS caseworker.

93. Plaintiff disputes material aspects of those recent allegations and possesses emails and records concerning them. Plaintiff does not presently allege that JFCS, its caseworker, the current owner, or the

current property manager participated in PGHA's earlier constitutional deprivation.

94. These present events are pleaded because Plaintiff's damages remain ongoing: after successive housing disruptions, she remains dependent upon temporary third-party assistance, lacks clear documentation of durable replacement assistance, continues to experience utility and tenancy uncertainty, and remains at risk of another displacement.

95. Plaintiff alleges the continuing instability interferes with employment, caregiving, transportation, ordinary family life, and Plaintiff's ability to maintain consistent homeschooling and daily routines for her son and stable routines with both children.

## VII. RECORDS WITHIN DEFENDANT'S CONTROL AND DISCOVERY

96. Plaintiff has pleaded the facts presently known to her without pretending to know PGHA's internal transaction codes, administrative

entries, approval chain, or undisclosed records. Those matters are principally within PGHA's possession or control.

97. Relevant PGHA records include applications and recertifications; HUD-50058 action histories; voucher issuance, expiration, termination, portability, transfer, and household-change records; family-composition and family-unit-size determinations; HAP contracts and ledgers; tenancy addenda; approved leases; rent and utility calculations; notices and proof of mailing; returned mail; hearing requests and decisions; case notes; supervisory approvals; and system audit trails.

98. Relevant records also include FSS participation and escrow records; SSI and income-verification records; repayment calculations; VAWA notices, certifications, confidentiality records, and disputed documents; communications with the Alberts, Murdock/Peninsula management, Rossman, and relevant VA/HUD-VASH personnel; and

records identifying the official or officials who authorized each challenged action.

99. Plaintiff also intends, at the appropriate discovery stage and subject to the Federal Rules of Civil Procedure, to seek relevant third-party records from nonparties whose documents bear on PGHA's notice, HAP administration, lease terms, tenancy addenda, utilities, eviction, causation, mitigation, and damages.

100. Plaintiff does not ask the Court at the pleading stage to presume that a voucher secretly remains active or that every missing record was intentionally destroyed. Plaintiff seeks discovery sufficient to determine precisely what PGHA did, under what authority, on what date, based on what evidence, and with what notice and hearing process.

## VIII. MUNICIPAL/ENTITY LIABILITY UNDER 42 U.S.C. § 1983

101. Plaintiff does not seek to hold PGHA liable merely because it employed Madsen, Pentelecuc, or another employee. Plaintiff alleges the challenged termination and administration were actions of PGHA itself, implemented through its official housing-assistance decisionmaking structure.

102. Plaintiff alleges that the termination or removal of her assistance was implemented, approved, maintained, or ratified as an official PGHA administrative action rather than merely an unauthorized private act of an employee.

103. The identity and scope of the final decisionmaker, delegated authority, applicable Administrative Plan provisions, approval chain, and any policy or custom relevant to the challenged action are reflected in records controlled by PGHA and are appropriately developed through discovery.

104. Plaintiff does not rely upon respondeat superior as the basis for § 1983 entity liability.

## IX. COUNT I

### 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS TERMINATION OF PLAINTIFF'S EXISTING 2021-2023 HCV ASSISTANCE

105. Plaintiff incorporates the preceding allegations to the extent they concern Plaintiff's own 2021-2023 HCV participation, PGHA's conduct, and injuries personal to Plaintiff.

106. Plaintiff alleges she was an existing HCV participant and possessed a legitimate claim of entitlement to continued assistance unless and until PGHA terminated that assistance through constitutionally adequate procedures.

107. PGHA acted under color of state law when administering and terminating Plaintiff's assistance.

108. PGHA deprived Plaintiff of that protected interest when it terminated or treated Plaintiff's existing HCV assistance as terminated in 2023.

109. Before the deprivation became effective, PGHA allegedly failed to provide notice reasonably calculated to reach Plaintiff, adequate disclosure of the actual grounds relied upon, and a meaningful opportunity to contest the termination before an impartial decisionmaker.

110. The procedural failure was material because Plaintiff disputed or would have disputed material facts concerning household occupancy, SSI and income disclosure, domestic-violence-related circumstances, VAWA protection, arrest information, and other adverse matters.

111. Plaintiff had previously requested records and a hearing and specifically sought VAWA-related information immediately before the termination sequence, yet PGHA treated her as already removed before Plaintiff received meaningful pretermination review.

112. As a direct and foreseeable result, Plaintiff suffered loss of housing assistance, housing instability, increased housing and

relocation expenses, interruption of FSS participation, housing barriers, employment and transportation disruption, and emotional distress.

## X. COUNT II - PLEADED IN THE ALTERNATIVE

### 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS 2025 TERMINATION OR ALTERATION OF PLAINTIFF'S OWN RECOGNIZED ASSISTED-HOUSEHOLD INTEREST

113. Plaintiff incorporates the 2025-2026 allegations only to the extent they establish Plaintiff's own recognized status, PGHA conduct, and injuries personal to Plaintiff.

114. Plaintiff does not bring this Count because she is Christine's daughter or because Christine was the qualifying veteran. Plaintiff brings it because PGHA records allegedly identified Plaintiff as Co-Head, contemporaneous communications stated that both Christine and Tracey were on the voucher, and termination of HAP directly exposed Plaintiff to market rent, debt, eviction, displacement, and property loss.

115. To the extent the administrative record establishes that Plaintiff herself possessed a protected existing participation, assistance, Co-Head, tenancy, or other benefit interest immediately before the November 30th, 2025 or December 1st, 2025 termination of HAP, Plaintiff alleges PGHA deprived her of that interest without constitutionally adequate notice and an opportunity to be heard.

116. If the evidence establishes that Plaintiff possessed no individual protected interest in the later assisted arrangement, Plaintiff does not seek through this Count to adjudicate Christine's independent entitlement.

117. Plaintiff alleges the challenged action was implemented, approved, maintained, or ratified through PGHA's official administrative decisionmaking structure.

118. As a direct and foreseeable result, Plaintiff alleges she was exposed personally to market rent and approximately $10,000 in claimed rent and/or eviction liability, eviction history, displacement,

personal-property loss, relocation and transportation expenses, employment disruption, caregiving disruption, and emotional distress, subject to proof.

## XI. PLAINTIFF'S COMPENSATORY AND CONTINUING DAMAGES

119. Plaintiff seeks compensation only for injuries personal to Plaintiff and legally attributable to proven violations of Plaintiff's own rights.

120. Plaintiff alleges economic injury including loss of housing assistance; rent and eviction exposure; approximately $10,000 in claimed Hardey Street rent and/or eviction liability imposed against Plaintiff personally; relocation, temporary lodging, storage, transportation, utility, and replacement-property expenses; loss or damage to personal property; employment and income disruption; and FSS-related economic loss or lost opportunity to the extent legally recoverable and proven.

121. Plaintiff further alleges non-economic injury including mental anguish, humiliation, loss of security, impairment of ordinary enjoyment of life, disruption of family routines, and emotional distress caused by repeated displacement and housing insecurity.

122. Plaintiff alleges that managing homelessness and repeated housing instability while parenting minor children and assisting an elderly parent consumed substantial time and attention, impaired ordinary family life, interfered with consistent homeschooling and parenting routines, and increased the practical and emotional consequences of other proceedings occurring in Plaintiff's life.

123. Plaintiff does not ask this Court to review, modify, or overturn any state custody judgment or to award damages belonging to her children. Those circumstances are alleged only to explain the extent of Plaintiff's own consequential and emotional injury.

124. Plaintiff does not allege that every hardship she has experienced was caused by PGHA. Plaintiff will tie each requested

category of damages to legally actionable conduct through records, testimony, and other admissible evidence.

## XII. PRAYER FOR RELIEF

125. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor on each claim proven; award compensatory damages in an amount established by the evidence; award nominal damages where appropriate for a proven constitutional violation; grant declaratory relief to the extent a live controversy remains; award taxable costs; and grant such other relief as the Court deems just and lawful.

## XIII. DEMAND FOR JURY TRIAL

126. Plaintiff demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

**Respectfully submitted,**

/s/ Tracey Coffin

**TRACEY COFFIN**
Plaintiff, Pro Se
Cape Coral, Florida
Email: coffinlegal@proton.me
Dated: October 6th, 2026